Good afternoon, Chief Judge, members of the panel. My name is Robert Koldrin with Hart, King & Koldrin. I'd like to reserve five minutes of mine. You have a clock in front of you and one that was left there. Thank you. I'd also like the court to recognize that my client, Ant Guggenheim, is present in the courtroom. And as is his partner, John Pierce. They're the owners, or I should say they hope they still are. If you will center yourself between the two mics, we'll get the best ability to hear you. Thank you. Is that better? I should say they hope they are still the owners of the Mobile Home Park at issue. Members of the panel, this is a draconian rent control law that exacts a complete wealth transfer. Those facts are completely undisputed. As is the fact that that was the condition when your client acquired the property. Isn't that the case? My client acquired the property in 1997. And the county of Santa Barbara had had a rent control law in effect since 1979. They had amended it in 87. So to that extent, it's a fact. But it is not true that my client acquired this property without entitlements to the constitutional protections that are to be afforded a property owner under the Fifth Amendment. Could he have sued the county? Pardon me? Could he have sued the county at that point? No, he could not have sued the county, of course, because in 1997, when he bought the property, the offensive regulation had been in effect for more than a two-year period. So that's what he acquired? He acquired a piece of property subject to the regulation. With a claim that he could not bring? Yes. No. Well, with a claim that he could not bring. He just told me he could not bring it because the statute of limitations had expired. He could not bring it against the county, certainly not on a facial basis. But under existing law, he would have been barred under the equity lifestyles case from the two-year statute of limitations, extension of 1983, to bringing it as a facial claim. Mr. Coleman, I have a question on that and then a related question. And that is, is there any such animal as a viable facial challenge under Penn Central? Yes. If there is, then would you mind saying precisely what your challenge is to the deficiency in this statute on its face? We have a Penn Central challenge to this particular statute, and there are other examples of Penn Central facial challenges. I would direct the Court's attention to the case of the Hodel case, which is the Indian inheritance rights case. And I would also direct the Court's attention to Sienega Gardens, which I also think is very instructive on the issue. That's the case where the government stripped the housing, the apartment owners, of their right to get out of the affordable housing program. Both of those are examples of facial as-applied cases. By the way, as is Penn Central. Excuse me. Facial takings cases under Penn Central. Are your clients in the position where they can't get out of the mobile business? Yes, they are. There is a scheme here in California, a panoply of a scheme, which is aptly set forth in the record below. My clients, as mobile home park owners, are stripped of the right to decide who will live in the park. They don't have the right to exclude. That came out in the Yee case, for example. They are stripped of the right to even recapture the space. Now, that's not an issue here, right? The right to exclude is not raised as a separate claim. Well, it's an issue here simply because of the, quote, straw that breaks the camel's back, close quote, issue of the Penn Central analysis. In other words, we have a whole panoply of regulations. I'm sorry. Is this something you raised in your complaint as a separate basis? Yes. It was part of the Penn Central analysis. Part of the, if you will, the number of sticks taken from the Lockian bundle, if you will. In other words, you find yourself with a property owner that already can't decide who's going to live on his property, already has to allow the incumbent tenant the right under state law to allow people to inherit that property, can't go out of business under the Ellis Act in California and other acts, can't effectively convert the property to another use because of change of use and anti-conversion laws, and now we have the city coming in and in a bare naked power grab saying we're going to strip this. This was all true, all these things you're telling us when your client decided to buy this property? He was subject to those regulations. He was not, however, when he bought this property and cannot, under the teachings of Palazzolo. My question was only you described this nightmare portrait where nobody would want to buy this trailer park. That's right. I asked whether that was all true when your client bought it. That regulatory scheme has been increasingly intensive within the state of California from 97, certainly through 2002. All the things you described were in existence when he bought it. Most of them were when he bought it. What was new? There have been changes in the law respecting conversion of mobile home parks to other uses. There have been legal challenges. Changes to make it easier? Depending upon your perspective, Judge Kaczynski. I'm just asking. I don't know. You say changes. I don't have to ask you what additional burdens I think I'm supposed to be asking, and you say changes. Changes can be for the good. So be specific. What is the additional burden? When I started practicing law in this particular mobile home park area 30 years ago, the mobile home residency law consisted of two pages. Today, the mobile home residency law, which limits the rights of the property owner relative to the residents in the mobile home park, is some 20 pages long. So it's a number of pages. Yes. It would take my entire argument to – Just give us one thing that he could do, that your client could do then that he can't do now. Just one thing. Not 30 years ago, but when he bought this property. The day after he bought it. He could outright prohibit subleasing under state law. And he can no longer do that? That's right. Now there's exceptions to the rule under state law. Okay. Back again. What is it precisely that your challenge is? We have brought a Penn Central – I know that. But what in the ordinance, what is it exactly that makes it invalid on its face? Two particular things. The first of them is that it imposes a rent freeze when it was adopted in 2002. It freezes my client's rents at a fraction of their 1979 values with no mechanism to adjust or take that into consideration. That's number one. Number two, it provides for a naked wealth transfer with absolutely no corresponding social benefit at all, in that it allows a tenant in my client's mobile home park who owns a piece of tin with an admitted value, an admitted fact in this case, of $14,000. That happened, the latter at least, happened clearly in 1979. I think that the California League of Cities brief may have somehow created a factual context that we all think exists that doesn't exist. Let me make one thing crystal clear. My client was vested with all of his rights to this property for a period of time in 2002. The city has characterized that as a moment – How long was the period of time? Perhaps as much as three months, perhaps four months. And that period of time came after his acquisition of the property? Absolutely. And by the way, during that – And he had no legal entitlement to that period of time. It came about as a windfall because of the city becoming incorporated. I believe the term windfall is in the eye of the beholder. What I'm saying, did he have any absolute right to get to that period of time, to get those rights that you say he had for possibly as long as three months in 2002? Our view as the property owner, of course, is that there's no expiration on my client's constitutional rights to utilize his property. That really doesn't seem to answer the question. Whatever rights you tell me he had for some undefined period of time in 2002, he didn't have those rights when he acquired the property. Did he have a right, an entitlement to get to that state of affairs, or did it happen because of outside circumstances? I'll put it another way. The statutory scheme abrogated his rights until 2002. The statutory scheme unlawfully and unconstitutionally stripped him of his rights. Was anything different before and after that period of time? Yes, many things were different. For example, the city keeps coming back to the fact that the ordinance had been in effect since 1979. When the ordinance was adopted in 1979 under the terms of the ordinances adopted by the county, and this is in the record as well, the terms of the ordinance adopted by the county recognized that the property owner might find himself with below market rents at the inception of the rent control law. And so the county said, you have two years, property owners. You can come in and you can say, I want to get my rents up to market. So before you start applying this confiscatory return formula that you have in your ordinance, at least you're at market. In 1987, when the county amended the ordinance, they did away with that catch-up provision. Why did they do away with that catch-up provision? Because the two years had expired. When the city incorporated and when the city made the discretionary decision, and I want to emphasize discretionary decision, over my client's strong objection to impose this rent control freeze, this rent control law on my client, my client's rents were demonstrably, under the district court's findings of fact and under the facts it elicited, demonstrably only a fraction of the rent levels that existed even in 1979. I know you have arguments to make. But at some point you've got to acknowledge what the facts are. I'm just trying to find out what was different before this period of time and after this period of time. And you keep going off and suggesting he's got some new entitlement. If you could answer the question, was there anything different in the bundle of rights he had before and after, when it was a county provision and when it became a city provision? He always had the exact same bundle of rights. The only difference was that he was restored to those full rights. He was restored to them during a period of time in 2002. That's the difference. Was there anything different before and after? And I'm really not trying to be argumentative here. What do you mean different? You have a pretty good impression of it. Well, I'm really not trying to do that. You keep saying what was different. What was different? What really changed? If you omitted that up to three-month period of time, is there any difference? No. I understand you've got legal arguments, but I want to find out if there's something different. As I believe you're using the term different, I don't think there was anything different. In December of 2002 versus, say, December of 2001, I don't think there was anything different in terms of the physical layout of the mobile home park. There was nothing different in terms of the tenant makeup of the mobile home park. Was there any difference in economic effect? On the face of the statute. Absolutely. On the face of the statute, what was the difference? Because it looks to me like they're identical. The statute is not an equivalent statute. I'm sorry. I just didn't hear you. I apologize. The statute is not an equivalent statute. The 1979 rent control law. 87, okay? The 87 one was in effect. Yes, that's true. The city incorporates and automatically it adopts by operation of state law. Initially. The Santa Barbara statute. Initially. A couple of months later, it volitionally, your discretion and its discretion, adopts the same statute. That's not exactly accurate. Well, what's inaccurate about it? The city, for example, talks about the gap as a moment in time. In fact, it was a, it was not a year. It was a. But we're not talking about the duration. The gap could have been 30 years. Okay. Was there anything different? No. Between, that's the question. Thank you. Counsel, I'm missing something here. And you must think I'm missing it because of my dissent. Help me sort out the issue of whether there is a regulatory taking from the issue of statute of limitations with a hypo. Suppose that the state builds a road in my neighborhood in the 70s. And they encroach, they take several feet of my land along the road. But at the time, I have a lot of land. A couple of feet don't make much difference to me in terms of use. And the value of acreage in my area at the time is pretty low. So it just isn't worth paying lawyers' fees to sue them. And they're not coming forward to pay me. So I've got a good claim for their taking, and I let it lapse. Subsequently, years later, I sell the land. The land is now worth a great deal more per acre. So it would be worth attorneys' fees to sue for that couple of feet along the road that the state took back in the 70s. It seems to me quite clear that that subsequent suit by whoever I sold the land to, quite aside from Pallett-Solo, Pallett-Solo doesn't mean that the purchaser is barred. It also doesn't mean it's revived if it's already dead. So this sale 20 years later, or many years later, I don't see where my buyer can sue for the states taking back in the 70s from me. And I don't see why this case is any different from that. Well, as to your first observation, that you don't think that the buyer can sue, I agree with you, Judge Kleinfeld. As to your second, that you don't see any difference between that case and this case, I see a number of differences. Let me begin by saying that to make your hypothetical work with respect to our situation, the state would have to remove its 3-foot encroachment for a period of 2 days or a period of 3 months or for a moment of time. To make the metaphor and the analogy work. Sometime after the buyer had purchased it. Exactly. So now the buyer buys the property, the state removes its unlawful encroachment, and then the state puts its unlawful encroachment back. Yes, that buyer absolutely has a right to sue. And that buyer has the statute of limitations, Judge Kleinfeld. But here the encroachment was only lifted for a couple of hours. That's not true. The encroachment was lifted. The stipulation that was entered into in the state court, remember this case went back to state court, the stipulation where the city conceded this gap in time, the stipulation simply says, quote, for a period of time, close quote. The city's brief talks about it as a moment in time or momentarily. I thought it was a couple hours on the day that they incorporated it. No, I was the lawyer below. I know. It was a period of arguably a period of at least two months, perhaps as many as three or four months. So it was not a period of two hours. There was a period of like four months between the point in time that the city was incorporated and the point in time that they adopted the offensive ordinance. Wasn't it reenacted as a matter of law before that? Pardon me? Wasn't it reenacted as a matter of law before that? Yes. There was a ministerial process under California law whereby when a new jurisdiction comes into being, their very first act is to adopt en masse all of the laws that they've inherited from the prior jurisdictions. So why doesn't that count? It does count. But after they had en masse adopted all of that, they then later on had a period of time where they had discretion to adopt or not adopt. And because of a failure to properly notice or a failure to properly hold a hearing on the right time, I forget the exact dynamic that was involved. But there was a period of time after that automatic moratorium period expired, I think it's a 60-day, perhaps 90-day period of time. 120 days would be better. 120 days, Judge Smith, thank you. There was a 120-day period of time. There was a substantial period of time after that. Now, substantial does not mean years. So I don't mean to be telling you it was years, but it doesn't mean a moment in time either, nor does it mean that there wasn't a discretionary act on the part of the city. We wrote letters. They're in the record. We wrote many letters to the city demanding that they not strip us of our constitutional rights. So you're saying that your land became worth a whole lot more during the substantial period of time after the 120-day automatic period ran out and before the city reenacted the ordinance. And when they reenacted well after incorporation, they, in effect, took value that the landlord had regained and gave it again to the tenants. Palazzolo, in effect, teaches that. Palazzolo and his project now. Well, but just a minute, just a minute, Counselor. The honest truth is that the city enacted the statute well within the 120 days, didn't they? The new statute in 1987. Or I mean in 2002. Yes, but in a period of time. Well within the 120 days. In other words, there was never any statute that was not in effect during that time period. The first statute was enacted immediately within two hours, and then the second statute was enacted on April 22nd, which is less than 120 days from the time they enacted the first statute. Isn't that true? I don't believe that is, Judge Smith. Well, that's what the record suggests is on April 22nd, the city again readopted the entire county code, including the rent control ordinance. There is a judgment, in effect, a judgment and an order on stipulation that is part of the record before this court. In fact, that's the whole reason the case has had part of this tortured history. It went back down to the state court. We argued whether or not the city had properly adopted everything it was supposed to adopt, and the city stipulated that there was a gap in time, a period of time, to use the term that's used in the judgment below, that the city's bound by and that this court is bound by as a factual finding. There was a period of time in which there was no rent control in effect in the city of Goleta. Was any tenant's rent increased during that time? No. There's a provision under state law, for example, another one of the rights we lose, is that we must offer all tenants a one-year agreement, and another right that we lose under state law is that we must give 90 days notice before a park owner can increase rents. Wasn't that period of time just a couple of hours on the day of incorporation? I don't believe so. What shows that it wasn't? Well. I mean, you've got a stipulation that says period of time. How do I know it refers to some substantial period subsequent to the 120 days and not to the couple of hours on the day of incorporation? I suppose that if the period of time during which my client was restored to his constitutional rights is somehow relevant to the inquiry, I suppose that would be one reason why under Rule 56 summary judgment clearly wasn't appropriate below, because that particular issue was simply not developed below. You're the plaintiff. You've got to show the facts. Remember, procedurally, we brought a motion for summary judgment, and we thought our burden is to come forward with sufficient evidence of the Penn Central factors to demonstrate that a take has occurred. And the city is supposed to come forward with sufficient facts to demonstrate that in balancing the Penn Central factors, we don't sustain our burden on motion for summary judgment. Remember, it was the trial court who, I believe improperly, and we've argued that in our briefs, we believe improperly, converted this into a Rule 56 situation, which resulted in its September 6th of 2006 ruling, which held erroneously that under Carson Harbor and under the sorts of theories that we took subject to the rent control law, that we weren't stripped of any economic value, and thus we failed. Even Justice O'Connor, in her concurrence in Palazzolo, confirms that that's just one prong anyway, or one factor anyway. So even assuming arguenda that that factor militates against us. I just don't see where Palazzolo helps you much. I mean, that was 100% shareholder in a corporation that owned real estate. He didn't maintain his corporate status properly with, I don't know, the fees, the annual filings of statements of directors, whatever it was. So the corporation automatically became defunct, and the 100% shareholder now became the holder of title to the real estate instead of the corporation in which he had held 100% of the shares. The government said, well, gee, the taking was from somebody else. He can't recover. And the Supreme Court said, yes, he can. In that circumstance, the economic value was taken from him either way. It was well within the statute of limitations. Except, Judge Kleinfeld, that the Palazzolo court uses that as an occasion to talk about how there's no expiration date on the Constitution, to talk about how we're not going to stick such a, quote, Hobbesian statement. We all enjoy using those rhetorical flourishes and opinions, but we still have to look at the facts in the holding. Yes, and the facts of Palazzolo and the holding of Palazzolo is that future generations also have the right to rely upon the constitutional protections. The fact is I recited them, and the holding was that the transfer of title did not extinguish the claim for compensation. I would simply offer, Judge, that I believe Palazzolo and all of the other cases, even up to the one of last Thursday, Stop Our Beach, all indicate that it is not a bar to a Penn Central challenge to have acquired the property subject to the regulation. It simply isn't. Nor is this a case where we acquired subject to the regulation. Counsel, looking at the evidence, is there anything in this record to support the notion that your client's interest in the trailer park was worth more than the minute before the city reenacted the county ordinance? Yes. What? What evidence? Quigley, John Quigley's very extensive expert testimony, which was unrebutted and which was accepted by the district. What part of John Quigley's testimony suggests that, in that period of time in which the council was making the new ordinance, the city ordinance, that all of a sudden his property enhanced in value? What part of it? I read it pretty carefully. Can you point me to the exact part? The part that says that 90% of the value was taken from? Well, that's general. That's general evidence, about 90%. There is nothing in his record that I read, unless you can show me, that said that at that particular point in time, when the city had not reenacted the ordinance, that somehow your client's property was worth more. There's nothing that I find, unless you want to point it to me. Because I miss things. Well, once again, the question is, is it a fact or not? And my view is if Dr. Quigley issues expert opinion on a question of value, and if that is accepted by the district court as being a fact, then that is a fact. Where's the page? Where's the page? Quickly. I've got it right here. Sorry, Judge Quigley. And I want to know the answer to Judge Smith's question. Where's the page where he says it's worth more at some point than it was subsequently, while the Guggenheim interests owned it? I would direct. I'm sorry. I could find it if I had the September 6th order of the court, because that's what the district court. I don't control what you take with you, but I'm sure that since the Quigley report is central to your case, you know it by heart. Just tell me the page. I know the conclusions of the Quigley report. I can't tell you if it's subsection B on page 72. I apologize. You didn't bring it to court with you today? I have all those 3x5 cards. I don't think I have that portion of the record. I see I'm down to less than 5 minutes. Do you have any portion of the record with you? Yes. But not that report. No. Okay. It must not be very important. Okay. We'll reserve the rest of your time. Thank you. Thank you. Good afternoon, Your Honors. Anthony Schwartz for the city. We think that the court should affirm the judgment on the merits because if you apply the three factors of Penn Central here, it's extremely difficult to reach the conclusion that there has been a taking. Do you believe that there can be a faithful challenge under Penn Central that conceivably one can't adjust? Yes. Certainly it's conceivable. I think it is very difficult to conceive of such a challenge because a Penn Central challenge is supposed to be an essentially ad hoc factual challenge. When you apply the three factors from Penn Central, the economic impact of the regulation, the interference with reasonable investment expectations, and the character, you really can't tell what the impact of most conceivable regulations are unless you have a factual inquiry. Well, it's a little bit difficult because it seems that the Penn Central factors lead over to the merits and to whether you can establish a faithful challenge. Do you want to correct me on that? Well, under a facial breastplate challenge, you would still apply the three Penn Central factors. But do we look at it a little bit differently to say that a person gets to move on to the merits? Well, a facial challenge is, by very definition, does the ordinance, the mere enactment of the ordinance, affect a taking based on the four corners of the ordinance, the provisions of the ordinance? You don't look at the Quigley Report and other facts about the economic impact of the ordinance on a particular property issue. That's an as-applied challenge. But it's very difficult to say that, in this case, that this ordinance on its face affects a taking. The Supreme Court in the Lingle case in 2005 really clarified the test for what is a taking. It said under the per se taking test of Lucas and Lodell and under Penn Central, the court's role is to determine whether the regulation is so onerous, has such a severe economic impact on the property, that it is equivalent or functionally equivalent to eminent damage for taking the property away. So it's very difficult to say here that this ordinance on its face… It has to be 100 percent or nothing? No, I'm not saying it has to be 100 percent. Because it's pretty clear here that the taking, the effect of the ordinance, was to make Guggenheim Rent 20 percent of market. Yes, that 20 percent of market, if before and after, now the test is before and after the regulation, if the regulation leaves value in place… Any value whatsoever? Well, that's exactly what they argued in Palazzolo. They said, Mr. Palazzolo, you own a lot of property here west of Westerly in Rhode Island, a place I'm somewhat familiar with, and you've still got this high land over here, you're trying to put sand in all the marshes, but you've still got this high land over here that you could develop for $200,000, so you haven't lost a thing. The Supreme Court reversed that. Yes, and following Palazzolo, the Supreme Court decided Lingle, where after about 27 years of experimentation after Penn Central, the court really came full circle back to this notion that a taking, if it's a regulatory taking, has to be the functional equivalent of eminent domain. What you're saying is it has to be 100 percent taking. Or very close to it. It's very difficult to discern. That means the state could take an easement and not pay for it, any kind of easement. Well, that may be a physical taking where the court, that would be the equivalent of eminent domain. Some easements are physical, some aren't. An easement of view, for example, is not physical. I don't think that's clear. A power line easement, usually they don't touch the surface, they just run a wire over it, and you can't do anything on the surface that interferes with their maintenance of the wire. That would be an acquisition of a title interest in property, and that could be deemed a physical taking. But I don't think. Could be deemed. Yes. It isn't. They haven't touched the land physically. You still get to put your wading pool there and run your dog there and have your dog pen there. All right. They didn't take it physically. Well. I mean, it could be argued. Just without arguments, not what happened. The lingual court said that all three of these tests really have to be the functional equivalent of eminent domain, which appropriates the property for public use. You're reading lingual to overrule Penn Central. I don't believe that I am. And since they didn't purport to overrule Penn Central, I don't think. I actually, I don't even see why you're arguing this. I would have thought you'd be more interested in your limitations issue. Oh, I'm arguing the merits? I'm arguing the merits because. I'm saying there's no taking at all. Well, here there's no taking at all. We don't need to. Now, I recall in the 80s the way offices were selling in my town, and I imagine many, was that if you bought a condo, your monthly payment would be about three times what the rent would be if you rented a comparable office or even an office in the same building or even rented a condo in the building. The reason was that one of the bundle of sticks was the possibility of future appreciation of the real estate. A lot of people expected future appreciation, and that's one of the things that they bought. So they're willing to pay extra for that stick beyond what the occupancy was worth. If that stick is taken away from the bundle of sticks, then they would no longer pay three times the rental value. I just don't see why that's not a taking. The lingual court said even Penn Central has to reach the standard of functional equivalent. So in a Penn Central case, what the court's saying is the economic impact, the interference with investment-backed expectations, these have to be extreme. They have to have an extreme economic impact on the property. Well, this one's pretty extreme here. I mean, the trailers, a $10,000 or $20,000 trailer sells for $100,000 or $120,000 because of the ordinance. The value of the ordinance to the tenant is worth maybe five times the value of the trailer. Here, the ordinance had no impact, Judge Kleinfeld, no impact. As you pointed out in your statement, most of the questions— Well, you're saying the 2002 ordinance. Yes. At this point, we're taking a step back. Assume for the moment we accept the proposition that all bets were off for a period of time in 2002. I take it your argument is addressing that circumstance. Because otherwise, I guess I'm sort of with Judge Kleinfeld. I'm not sure why you're taking on the big task if the easier road's ahead of you. I didn't intend to take on that task. I'm merely saying that— You were arguing that there was no taking in 1979. On its face, I don't believe that the Court could say there was a facial taking in 1979. An ordinance— Because the ordinance didn't say this is a facial taking. Unless the ordinance says this is a facial taking, according to you, there cannot be a facial taking, correct? The test under Penn Central is economic impact, and Lingle tells us that the economic impact has to be extreme. I'm not saying it has to be 100 percent. It says it has to be— 80 percent do? Pardon me? The argument here is that it's 80 percent. That's not extreme enough? 88 percent? I don't believe if there is substantial value in the property, if the property owner can make a fair return, that would not be the equivalent of eminent domain. Eminent domain is you're taking the property away. If you don't have the property anymore, you really don't have use of the property to make profits. The property doesn't have much value. I don't think we need to reach— I gather you're answering these questions. Ted Kleinfeld asked why you're making this argument. I gather you're making the argument because you're asked these questions. But he asked why you don't get back to your point about this case, not about whether it was invalid in 1979. This case involves an ordinance where it's alleged that the ordinance was adopted in 2002. It was merely the continuation of an ordinance that is identical to the ordinance that was in effect when the property owner bought the property. Could I ask you about that question? I find the statute of limitations issue perhaps one of the most troubling. So we've said that the takings claim accrues at the time of enactment of the ordinance. So there was an enactment in 1987, and then a different local government entity, the city, reenacted it again in 2002. So same ordinance, or essentially the same, but a different enactment. So I've seen some cases where the same government entity enacted the same ordinance, and we've said that doesn't matter. But what's your best case for a different government entity enacting a new ordinance? Why doesn't that restart the statute of limitations? Well, I think the cases you may be referring to are the DeAnza case and the Daniel case, where there was a continuation of an ordinance that had been in effect. This court found that there was no damage, there was no taking, that nothing was taken from the property owner. I'm just talking about when did the cause of action accrue for purposes of the running of the statute of limitations? I think we have to look at what is the test for a taking. Well, could you answer my question about when the cause of action accrues? The plaintiffs allege that the cause of action accrued here in 2002. Right, when there was a reenactment, but there was an enactment really for the first time by the city. Yes. So why doesn't it accrue at that point? What's your best case for saying it doesn't? I'm not arguing that the statute of limitations bars this claim. I'm arguing that on the merits, as Judge Kleinfeld recognized in his dissent, that the test for a taking is what's the market value of the property before the regulation was imposed and what's the market value after it was imposed. So the reason you're arguing the way you are is you don't want to win on the theory that I argued in the dissent. Well, I do. I think that it's consistent with your theory, which is that nothing was taken from them. They bought the property subject to the regulation. So immediately before the regulation was enacted in 2002, it's worth the same as it was after it. Nothing was taken from them. Counsel, didn't they have... No injury. Couldn't you just hypothesize that the Guggenheims were very far-sighted investors and when they bought, they said someday this rent control ordinance will be found unconstitutional and if we have the good luck to have it found unconstitutional within a statute of limitations period, we'll score big, right? What's wrong with that as a reason, what they call it, investment-backed expectation? Don't people buy on high hopes all the time, whether it's antiques or stock market, as Justice Scalia mentions in his concurrence in Palo Zola, or real estate? That formulation, Judge Bale, would swallow the rule in that you can always postulate that a court will find that the regulation that you allege affects the taking is unconstitutional. That happens from time to time. Courts do find statutes unconstitutional. In regulatory takings, it's extremely rare. And at the time that the property owner bought the property, there was nothing in the jurisprudence to indicate that that ordinance was unconstitutional. But it would swallow the rule if that were true. You wouldn't have any... The reasonable investment-backed expectation factor would always be met because you can always postulate that an ordinance can be challenged and that a court might find it to be invalid or unconstitutional. Well, in the Penn Central balancing test, how unreasonable and how high odds it was can be balanced as one of the three factors, right? That is correct. And so it goes to the plausibility of the scenario that you've laid out. But I think that particular scenario is really quite circular. If this court finds the ordinance to be unconstitutional, then we can't relate back to the 1997 when the property owners bought the property. In fact, when they bought the property, there was a person... Because the statute of limitations bars it. But it doesn't bar the action in 2002, does it? No. And you can always, again, you can postulate that the area might incorporate and that the ordinance may be reenacted as required by law and that the court may find it unconstitutional. You have to have reasonable investment-backed expectations have to be objectively reasonable. And there was nothing at the time... If it's submitted to a jury to see if it's objectively reasonable. I don't think that's a jury question. I think that is a judge question. And how do you suggest that that factors into a facial challenge? Because Penn Central articulates that as being distinct investment-backed expectations, meaning of an investor, which isn't relevant on a facial challenge. I agree. I also point out in 19... Well, then how do we approach that? I think it's very difficult to conceive of a facial Penn Central challenge. The United States Supreme Court has never found a regulation to constitute a Penn Central taking on its face. It's very difficult to conceive of it because the court said in Hodel, given the essentially ad hoc factual inquiries involved in the takings analysis, we found it particularly important in takings cases to adhere to our admonition that the constitutionality of statutes ought not to be decided except in an actual factual setting that makes a decision. You said it's very difficult to conceive of, but you said it's not your position that there couldn't be one. I have extreme difficulty conceiving of a facial Penn Central. Why don't you strain your imagination and come up with one? I mean, you're a lawyer. You can come up with it. A case like the Lucas case. Let's not look at the real case. Let's just hypothesize a case and work our way back from that. Let's say you own the Penn Central terminal, and all of a sudden New York City says, okay, everybody out of the building, you can't rent it, you can't use it, you can't run trains in it, you can't have tenants. It just has to sit there as a building. That's correct. That wasn't hard, was it? No, I know what it means to a grown man. Okay, so now we've got a case. This is not so hard to conceive. Let's work our way back from that. It's hard to conceive of. So you think that would be a regulatory taking a facial challenge, right? Subject to a facial challenge. It wouldn't be much weighing or anything we'd have to do with that, right? Well, you'd have to look at the economic impact of the regulation. You get to pay taxes. You don't get to collect any rent. Fine. What else do you need to know? Well, did the regulation interfere with investment-backed expectations? What's the character of the regulation? If the regulation was in the nature of a physical taking, then that would meet the character factor of the Penn Central test. I mean, you're asking a lot of questions, but all of which I think I've answered with the hypothetical I gave you. No, it doesn't involve a physical invasion. It says people are out. I mean, all the questions you're asking have been answered by the facts I've given you. Why don't you come up with a question that hasn't been answered by what I've told you? If the regulation on its face prevented profitable use of the property. I told you, you can't collect rent. I mean, you can't collect rent. You can pay taxes. You can pay upkeep on the building if bricks start falling, or you can go in and fix it, but you can't do anything else with it. If it prevented all use except open space, for example, that could very well be a Penn Central facial challenge. Could very well. It's as close as you're going to get. It could, but it's very difficult to conceive of a regulation like that, and this regulation doesn't approach that. Again, this regulation. And why not? I don't find it hard to conceive. I mean, a lot of towns have rivers that run through them. That's why the towns are there, and it's easy to imagine a town having an ordinance saying, there shall be no development of any kind on any land not already developed within one mile of the river on either side, because we want to preserve the beauty and delight of the natural riverfront. Well, that type of regulation would raise questions about background principles of state law. Are there background principles that would allow the city to regulate use to prevent a nuisance or to achieve some other background principle? If you could tell from the face of the ordinance that it wouldn't allow any use on the entire property, then that could very well be a facial Penn Central take. What will it take to get you to say, yes, it is, and it could very well be? I mean, you said it's unimaginable. I can't imagine it's inconceivable. Now you're able to conceive it. How can we get you closer? It's difficult to conceive it. But the court has proposed several ordinances, and I'm acknowledging that under those hypotheticals, you may have a facial taking. But the jurisprudence has very few examples of such ordinances. That's why I say it was difficult to conceive of an ordinance that would go that far such that you could tell on its face that it was a taking. That's why there's never been a fighting. Let's talk a little bit about Penn Central in those cases. What Penn Central in those cases talk about is diminution in value. So what you have is you've got land or a building or whatever, and the government passed a regulation, and as a result of that regulation, the market value or the value of the property to the owner is lessened. Let's say, for example, they say there's a setback. So it used to be able to build all the way to the sidewalk. Now they say you can't. You've got to have a 20-foot or 30-foot setback. Or it used to be able to build a tall building, and now they're saying you've got to limit the height to a certain height. And at that point, you say, well, as a result of the regulation, the property is worth less, and the regulation has the effect of transferring value to the public at large. Now that's really not quite the claim here. The claim here is that there is a diminution in value to the owner of the park, but a direct transfer of value, not to the public at large, but to individual tenants. Is that situation still covered by the Penn Central test? Yes, but there's no allegation here. Well, he seems to suggest that for purposes of regulatory taking, you could look at that fact just as you could look at the fact that the landlord can't name or can't pick his tenants as, you know, they say it's not a physical taking, and they may be right about that, I don't know. But they certainly, that's what they held. But they said it could be regulatory taking. Why is that the claim we have here, and why isn't that what we have to look at? Well, we are looking at a regulatory taking here, not a physical taking. But they don't say that you have to have, in that situation, like Penn Central, basically complete diminution in value.  Here they're claiming something else. They're claiming, you're sure we still have substantial value left, but a chunk of what is rightfully ours has been transferred to identified individuals. You're describing a situation that's true for most regulation property, which is that... No, it's really not. If you have a setback, or if you have, what we were talking to Jeff Kleinfeld about, or Jeff Kleinfeld gave you a hypothetical where they have a regulation and say, because we want to have scenic beauty for the city, you're not going to be able to build near the river, because you want people to walk down the street to be able to see the beauty of the river. There you're really not transferring any value, any identifiable market value to specific individuals. Here they're claiming that, in fact, what the regulation does is not only diminishes the rights of the property owners, but transfers all of the difference in value to the tenants. That's at least different from your normal regulatory taking case. That is correct, and I don't believe that's the test. The test is diminution in value. We know that from Penn Central, from the Keystone case. Well, diminution in value is in a situation where you have a diminution in value, not a transfer to identify the individuals. What I'm suggesting is that this may be a different kind of case, and that the Penn Central test that talks about essentially no value left to the owner maybe doesn't apply to a situation where you have a transfer of wealth. I don't think that a case where there has been a diminution in value because a regulation restricts the use of the property states the taking. You have to have an extreme impact on the market value of the property because all regulation I understand that, and I gave you that. I do understand that for when all you have is a diminution in value. Here we have an additional claim. It's not just a diminution in value to the owner. It is an actual specific transfer to identify the individuals of a value. That makes it different from Penn Central. In Penn Central, nobody got the additional, no single individual got additional value from preserving the building. It was also the New York City and all the tourists and all the neighboring owners and the community as a whole shared in this value. Here there is a claim that value was transferred to identify the individuals. And I'm just wondering, do you have a Supreme Court case that tells us that that is governed by the Penn Central test? Well, yes. I think all Supreme Court cases talk in terms of diminution in market value of the property That's because he's asking you if there are any cases in which it's not just the landowner or the defendant or the person whose property is diminished in value. Are there any cases where the other party gains the economic loss? Yes, the Pennell case. Which is a? The Pennell case. Pennell v. San Jose is a United States Supreme Court case, 1988. The court upheld rent control against a substantive due process violation. There the court found exactly that. Well, yes, while the rent control ordinance may effectively transfer value, transfer benefits from the landlord to the tenant, that doesn't make it a substantive due process violation. Well, is that not true in any rent control case? That is correct. The tenant gets the benefit of what the landlord loses. Is it not like any minimum wage case where the employer is penalized and the worker gets those funds? Yes, and it's true for zoning as well. I think in the Penn Central case, those who lived closer to Grand Central Terminal benefited more than those who lived far away in not having their views obstructed, having a 50-story office building over them. It's the same thing with height limits in any neighborhood of any city. Well, but let's say this in turn. The regular tenants can't sell the right to occupy to the next tenant. They can't control who sells. Unlike with mobile parks where the tenant can sell the piece of tin and that selects the next tenant and they can reap the premium for the fact that the old trailer can sit there at a reduced rate. That doesn't happen in regular rent control. Correct. The California legislature looked at this question and they adopted the Costa-Hawkins Act of 1996, which ruled out vacancy control in ordinary residential housing. But it left intact vacancy control for mobile homes because they are special, and this ordinance, this RCR... Well, all you're saying is that the case you cited, Pennell, doesn't really apply. So the answer to the question I asked and Judge Reinhart managed to perfect is no. There is no other case because regular tenants are different. You just said, you know, this is very special. Maybe this should be treated the same way, but it sounds to me like you've just conceded that there is really no other case. Well, this court has upheld mobile home rent control in other contexts, and in those cases it was alleged that... Nobody is purporting to say it's unconstitutional. We're not talking about takings. Takings presume that the regulation is valid and then provides compensation. I guess my point is that all regulations, including regulations such as vacancy control in mobile homes, impose disproportionate benefits and burdens on all property owners. It's true for all regulations. Awfully general. I mean, you could have a rent control ordinance that said rents in property where the ownership of the personality is separated from the ownership of the realty cannot be raised more than 6% per year.  But it would not have nearly the cataclysmic transfer of wealth that the type of ordinance Goleta has imposes. That may be true. There are a lot of possibilities. It's hard to talk that generally. But I think what the court was saying in Lingle is we've had a long period... Let's talk about Lingle. You know, I couldn't remember it saying what you described it as saying about Penn Central, so I just looked at it again, and I still can't find it. All I can really find in Lingle and the way of holding it is they say 25 years ago the court posited that a regulation of private property affects a taking if it does not substantially advance a legitimate state interest. Today we correct course. We hold that the substantially advances formula is not a valid takings test and conclude that it has no proper place in our takings jurisprudence because Chevron advanced only a substantially advances theory in support of its takings claim it was not entitled to summary judgment. It looks like that's all she wrote. I'm looking at 544 U.S. page 539. 539, okay. 539. It starts the paragraph with the word although. I'll read it. Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquiries, and in parentheses, reflected in Loretto, that's the physical takings, Lucas, the White House, and Penn Central. Yeah, it seems she reaffirmed Penn Central instead of overrule it or narrow it. Well, it says share a common touchstone. I'm reading on it. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or else the owner from his domain. Oh, I get it. You're running with that, and you're saying that the holding goes beyond what the court said the holding was, that they're also implicitly limiting Penn Central to takings that amount to ousting the owner from his domain. Well, it's functionally. I see where you're doing it. I don't buy it, but I can see now how you're doing it. I think what the court's saying here, it's got to be extreme impact. In this case, we have no impact. As you pointed out, Judge Cohenfeld, nothing was taken from these property owners because their property was worth the same before the ordinance as after the ordinance. Nothing interfered with their reasonable investment fact expectations because they bought the ordinance with the ordinance in effect, and when the ordinance was adopted. That's your Palazzo argument again. I'm sorry? That's your Palazzo argument again. I don't think Palazzolo is controlling it. Palazzolo. No, no, but it's that argument. It's that nothing happened because it was worth the same before the ordinance as after. No, that's my economic impact. The first Penn Central factor. You're not going to dispute that the first time the ordinance was passed, whenever that was, that those people, whoever they owned, suffered a diminution in value. They probably did, yes. So now we're asking the question, does this still apply today? Is it too late? And that's the question Palazzolo seemed to leave open, subject to Justice O'Connor's concurrence on all that. But if we take Justice Kennedy as his word, that's what he says in Palazzolo, it says it doesn't matter. At any point in time, you can still raise a constitutional challenge. I don't think that's what he's saying. I think he's saying in an as-applied challenge. I understand, but that is that argument, as opposed to the argument as to whether this kind of ordinance can be a regulatory taking. Well, I... It's a timing argument. I'm not making a Palazzolo argument. I'm making a Penn Central argument applying the economic impact and rebate factors. You answered Judge Kaczynski's question by saying, yes, it would be a diminution in value. You didn't say it would deny an owner economically viable use of his land. Correct. Which was the Hodel standard. That is correct. And it's very close to the standard as the Court, I think, clarified in Lingle. I'm applying the Penn Central factors. Well, forget Lingle. Judge Kleinfeld is not an admirer of your Lingle argument. I'm applying... Well, we try another case. I'm applying the Penn Central factors, as Judge Kleinfeld did in his dissent, based on the Equity Lifestyle case and the Daniel case. Under the Penn Central factors... Thank you. Thank you. I think you're out of time. We'll give you a minute for rebuttal. No, you're not. You've got two minutes and 40 seconds. You've got an eternity. You can get into infinite trouble in that time. Certainly not a moment in time, a substantial period of time. But in any event, since my time is running, I should stop. I'm going to try the test on you and see whether you agree with the test as expressed in Hodel v. Virginia, in which they rely on Agins and Penn Central to say the test to be applied in considering the facial challenge is fairly straightforward. The statute regulating the uses that can be made of property affects the taking if it, quote, denies an owner economically viable use of his land. That's one of three that Penn Central announced. Very important to understand this. Penn Central said you can have a physical takings case in a regulatory environment, i.e., the Penn Central... That's one of the factors. You agree that that's one of the factors. I agree that under Penn Central that's a per se take. When we say Penn Central, we mean the balancing of factors. There's no balancing of factors. If government regulation takes all economic value for your property, no need to look at character of regulation. No need to look at investment-backed regulation. Automatically a per se take. But what we have here is a Penn Central analysis, and this panel has spent an awful lot of time on the economic impact prong of the multi-factor test. So that's one prong you don't meet. We do meet it, 90 percent, fully 88 percent or 90 percent of the value of the property for the enactment. So you're denying economically viable use of your land. No. The economic impact prong, we have a very substantial and good argument there that a lot of diminution occurred, that an awful lot of our property interest was taken the moment the city of Goleta adopted the unconstitutional ordinance. Then we say, okay, so we do well on the economic prong. How much exactly do you say was taken? I think the court said, and again you're going to ask me for the Quigley record, but it was between 88 and 90 percent, I think 80 percent of the value. How did he get that? How did Quigley get it? He did a- He's just plain wrong about that. The district court found- He's just plain wrong about that because he's talking about the value of the trailer. Who cares about the value of the trailer? What matters is the value of the property owner. And doesn't he say the property owner has $200,000 in value in the- No. His rents were frozen. See, another draconian feature of this ordinance, in addition to this naked wealth transfer, was that rents were frozen at 20 percent, 20 percent of their market value. You cut in with something irrelevant. Doesn't he say that each of the plots on which the trailer sits is worth, what, $200,000? I believe that is something else he says, yes. You see, if you just listen to the question, you will answer it. Haven't they? And didn't he also- If the plot of land is $200,000 and then $100,000 was transferred, according to him, to the owner of the trailer, why isn't that a 33- That would be a 50 percent reduction, 200,000 to 100,000. It depends on which way you go. That's right. If you're going down, it's a 33 percent reduction. You're correct. If you go from 300,000 to 200,000, it's 33 percent. You're correct. He says it's not- So why isn't that the end of the case for you? Because 33 percent is not nearly 100 percent, and even if we accept your expert's figures, we're only talking about 30 percent or 33 percent in the reduction. Because, unlike the position being advanced today by some, which is that you look to see whether all economically viable use was taken, what you do in a Penn Central analysis is you look at at least three, possibly more than three factors. One factor is the economic impact. Maybe it's 50 percent. Maybe it's 33 percent. Maybe it's 20 percent of value. Who knows? But it's a lot. It's substantial. Okay? But that isn't dispositive. You need to look at the two other characteristics. You need to look at the character of the take, and Penn Central itself says that. Penn Central itself says- But you do accept that this 90 percent figure you've been bandying about is bogus? No. It's not 90 percent of anything that the owner of the mobile park owns. Unfortunately, I am forced to accept it because that's what the district court accepted. I think you must have said 90 percent about six times during our argument today. So it's tricky for the record. I think there was another question. Very quickly on character of the take. I think we're done. I'm sorry. Was it Judge Smith? There was a question. Time has run. Thank you, Judge Bartoski. Thank you. Okay. Thank you very much. Case is argued. We stand submitted. We are adjourned.
judges: Hearing Panel: Goodwin, Kleinfeld, Bybee en Banc Panel: Kozinski, Goodwin, Pregerson,reinhardt, Rymer, Kleinfeld, Wardlaw, Gould, Clifton, Callahan, Bea, Ikuta, Smith N.R.